UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LINDA BROWN, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Cause No. 3:14-CV-1470 RLM-MGG |
| | ) |
| BIOMET ORTHOPEDICS, LLC, | ) |
| | ) |
| Defendant | ) |

OPINION AND ORDER

Linda Brown sued Biomet for damages in connection with the alleged failure of her Biomet hip implant. Biomet moved for summary judgment, arguing that all of her claims are time-barred by the applicable statutes of limitations based on (1) a proposed date on which all plaintiffs were on constructive notice of potential claims and (2) facts specific to Ms. Brown. For the reasons stated below, I will grant Biomet's motion.

I. STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Protective Life Ins. Co. v. Hansen, 632 F.3d 388, 391-92 (7th Cir. 2011). I must construe the evidence and all inferences that reasonably can be drawn from the evidence in the light most favorable to Ms. Brown, as the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). As the moving party, Biomet bears

the burden of informing me of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If Biomet meets that burden, Ms. Brown can't rest upon the allegations in the pleadings, but must "point to evidence that can be put in admissible form at trial, and that, if believed by the fact-finder, could support judgment in [her] favor." Marr v. Bank of Am., N,A., 662 F.3d 963, 966 (7th Cir. 2011); *see also* Hastings Mut. Ins. Co. v. LaFollette, No. 1:07-cv-1085, 2009 WL 348769, at *2 (S.D. Ind. Feb. 6, 2009) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."); Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005) (summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events").

II. THE PROPOSED BAR DATE

First, Biomet asks me to establish a bar date applicable to all plaintiffs. Biomet argues that enough information was publicly available to put any reasonable plaintiff on notice by February 10, 2011 that her injury might be connected to Biomet's M2a Magnum metal-on-metal hip implant. As Biomet sees it, if a plaintiff was injured on or before February 10, 2011, the statute of

limitations would begin to run then. If a plaintiff was injured after February 10, 2011, the statute of limitations would begin to run on the date of injury.

The discovery rule postpones the accrual of a cause of action until the plaintiff knew, or through exercise of reasonable diligence should have known, that she was injured. *See, e.g.*, Fla. Stat. § 95.031(2)(b); 735 Ill. Comp. Stat. 5/13-213(d); N.C. Gen. Stat. § 1-52(16); Wash. Rev. Code § 7.72.060(3); <u>Martin v. Arthur</u>, 3 S.W.3d 684, 690 (Ark. 1999); <u>In re Med. Review Panel of Howard</u>, 573 So. 2d 472, 474 (La. 1991); <u>Moreno v. Sterling Drug, Inc.</u>, 787 S.W.2d 348, 351 (Tex. 1990).

Biomet contends that this publicly available information put a reasonable plaintiff on notice of a potential claim by the proposed bar date: the device's Instructions for Use, articles in medical journals, press reports, and the Food and Drug Administration's websites. The Instructions for Use for Biomet's metal-on-metal hip implants disclosed that using the device could pose a risk of exposure to metal debris, including osteolysis, metal hypersensitivity, and elevated metal ion levels. Eight 2010 medical journal articles raised concerns about the risks associated with metal-on-metal hip implants, including an editorial in the Journal of Arthroplasty, the official, peer-reviewed journal of the Association of Hip and Knee Surgeons. *See* Ross Crawford et al., *Metal on Metal: Is it Worth the Risk?*, J. ARTHROPLASTY, Sept. 2010, at 1.[1]

---

[1] *See also* Joseph Daniel et al., *Renal Clearance of Cobalt in Relation to the Use of Metal-on-Metal Bearings in Hip Arthroplasty*, 92 J. BONE & JOINT SURGERY 840 (2010); C. Delaunay et al., *Metal-on-Metal Bearings Total Hip Arthroplasty: The Cobalt and Chromium Ions Release Concern*, 96 ORTHOPAEDICS & TRAUMATOLOGY: SURGERY & RESEARCH 894 (2010); Brian M. Devitt et al., *Cobalt Ions Induce Chemokine Secretion in*

Biomet argues that news reports from early 2010 reporting on the risks of metal debris with metal-on-metal hip implants also put plaintiffs on notice of potential claims. *See, e.g.*, Barry Meier, *As Use of Devices Grows, Studies Raise Concerns*, N.Y. TIMES, Mar. 4, 2010.[2] More news reports followed DePuy's August 2010 recall of two ASR metal-on-metal hip implants. *See, e.g.*, Natasha Singer, *Hip Implants Are Recalled by J. & J. Unit*, N.Y. TIMES, Aug. 27, 2010.[3]

Last, Biomet contends that the FDA notified the public when it launched two websites discussing potential health risks of metal-on-metal hip implants by February 10, 2011. *See Concerns about Metal-on-Metal Hip Implant Systems*, FOOD & DRUG ADMIN. (last updated Feb. 10, 2011), https://web.archive.org/web/20110214064145/http://www.fda.gov/MedicalD

---

*a Variety of Systemic Cell Lines*, 81 ACTA ORTHOPAEDICA 756 (2010); Monika Huber et al., *Postmortem Study of Femoral Osteolysis Associated with Metal-on-Metal Articulation in Total Hip Replacement*, 92 J. BONE & JOINT SURGERY 1720 (2010); Takao Imanishi et al., *Serum Metal Ion Levels after Second-Generation Metal-on-Metal Total Hip Arthroplasty*, 130 ARCHIVES ORTHOPAEDIC & TRAUMA SURGERY 1447 (2010); Ajay Malviya et al., *Metal-on-Metal Total Hip Arthroplasty*, 92 J. BONE & JOINT SURGERY 1675 (2010); Michael C. Parry et al., *Thresholds for Indirect DNA Damage Across Cellular Barriers for Orthopaedic Biomaterials*, 31 BIOMATERIALS 4477 (2010).

[2] *See also* Barry Meier, *When New Hips Go Bad*, N.Y. TIMES, Mar. 4, 2010; Barry Meier, *Alert Follows Withdrawal Of Hip Device*, N.Y. TIMES, Mar. 10, 2010; Harvard Health Letters, *Hip Replacement Candidates Have Several Surgical Options*, SUN-SENTINEL, Mar. 24, 2010; Sue Scheible, *You Don't Have to Be Old to Get a New Knee, Hip or Shoulder*, NEB. CITY NEWS-PRESS, Apr. 5, 2010; Peter Benesh, *Stryker Promotes Hip Technology*, INVESTOR'S BUS. DAILY, Apr. 16, 2010.

[3] *See also* Jonathan D. Rockoff & Jon Kamp, *J&J's Latest Recall: Hip-Repair Implants*, WALL ST. J., Aug. 27, 2010; Nora Tooher, *Litigation Mounts over DePuy Hip Replacement Device*, LAWYERS WEEKLY USA, Oct. 4, 2010; Nelson Daranciang, *Woman Sues over Hip Implant Device*, HONOLULU STAR-ADVERTISER, Oct. 27, 2010; Steve Daniels & Silvia Gambardella, *Hip Implant Recalled Amid Concerns About Heart Failure, Dementia*, ABC NEWS, Dec. 1, 2010; Barry Meier, *The Implants Loophole*, N.Y. TIMES, Dec. 17, 2010; Barbara Peters Smith, *The Enemy Within*, SARASOTA HERALD TRIB., Dec. 21, 2010.

evices/ProductsandMedicalProcedures/ImplantsandProsthetics/MetalonMetal HipImplants/ucm241604.htm; *Information for Patients Who Have Metal-on-Metal Hip Implants*, FOOD & DRUG ADMIN. (last updated Feb. 10, 2011), https://web.archive.org/web/20110528045143/http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/MetalonMetalHipImplants/ucm241766.htm. These websites warned that metal-on-metal hip implants might leave debris that could damage bones and tissue surrounding the implant, and encouraged people to contact their physicians if they experienced any symptoms. Biomet argues that the combined effect of the Instructions for Use, journal articles, press reports, and FDA warnings put a reasonable person on notice of the connection between Biomet's device and an injury from exposure to metal and metal debris no later than February 10, 2011.

Three district court decisions in MDL dockets inform Biomet's analysis. In In re Avandia Marketing, Sales Practices and Products Liability Litigation, Judge Rufe held that a bar date was appropriate because the cumulative effect of publicity about a prescription drug's relationship to adverse cardiovascular events was sufficient, as a matter of law, to put an individual who had been injured on notice that Avandia could be to blame. No. 07-MD-01871, 2012 WL 3205620, at *4 (E.D. Pa. Aug. 7, 2012). This publicity included:

1. a New England Journal of Medicine study finding that Avandia increased the risk of heart problems by forty-three percent;

2. a joint statement from the American College of Cardiology, the American Diabetes Association, and the American Heart Association expressing concern and advising patients to speak to their physicians;

3. an FDA advisory committee conclusion that Avandia increased heart risk;

4. FDA action requiring that a warning be added to Avandia's label;

5. the drug manufacturer sending letters to healthcare professionals on studies linking Avandia and heart health;

6. the drug manufacturer publishing a "Dear Patient" letter about the risks of heart problems;

7. a wave of media attention following the above, including lead stories on the national nightly news; and

8. numerous lawsuits filed against the drug manufacturer, leading to the formation of the MDL.

*Id.* at *3. Evidence that Avandia prescriptions dropped by forty-five percent and sales by fifty-four percent as of the proposed bar date showed that these events "were regarded as significant by physicians, patients, and attorneys." *Id.* at *4.

In the MDL docket involving Vioxx, Judge Fallon applied a bar date to multiple plaintiffs based on:

1. a medical study finding that Vioxx triggered a significant increase in abnormal cardiovascular events;

2. media reports linking Vioxx to cardiovascular risks;

> 3. a new Vioxx label that the manufacturer submitted, the FDA approved, and resulted in substantial press coverage;
>
> 4. filing of a class action; and
>
> 5. the manufacturer removing Vioxx from the market, triggering "arguably the largest and most-publicized prescription drug withdrawal in this country's history."

In re Vioxx Prods. Liab. Litig., 522 F. Supp. 2d 799, 803, 808, 814 (E.D. La. 2007). The court held that "[b]oth the national and local media coverage of the withdrawal of Vioxx from the market were sufficient to put the plaintiffs on notice of a potential link between their alleged injuries and the use of Vioxx." *Id.* at 808.

In the Zyprexa litigation, Judge Weinstein held that a bar date was appropriate when:

> 1. the FDA announced it would require an additional warning on the drug's label;
>
> 2. leading medical associations issued a consensus statement concluding that Zyprexa posed a risk; and
>
> 3. the drug manufacturer distributed a "Dear Doctor" letter to physicians nationwide informing them of the label change.

In re Zyprexa Prods. Liab. Litig., 727 F. Supp. 2d 101, 107 (E.D.N.Y. 2010); *see also* Burrell v. Astrazeneca LP, No. CIV.A. 07C01412(SER), 2010 WL 3706584, at *6 (Del. Super. Sept. 20, 2010) (establishing a bar date in litigation regarding Astrazeneca's Seroquel).

7

I can't say that, as a matter of law, the notice to a reasonable plaintiff of a potential claim against Biomet approached what happened in the Avandia, Vioxx and Zyprexa cases. First, in both the Avandia and Zyprexa cases, the manufacturer published or distributed letters alerting patients or physicians to the risks associated with the product. This would have been the simplest way for Biomet to put all of its customers on notice of a potential claim, and Biomet chose not to do so.

Second, two of the three cases included substantially more press coverage than that surrounding Biomet. For example, in the Vioxx case, Judge Fallon noted that the press coverage was "arguably the largest and most-publicized prescription drug withdrawal in this country's history." In re Vioxx Prods. Liab. Litig., 522 F. Supp. 2d at 803. In addition, the coverage in Vioxx was the result of the company pulling its product from the market. Biomet didn't opt to make such a clear signal to consumers of its product's potential risk.

Third, two of the three cases included statements from leading medical associations highlighting risks associated with the product. Biomet points to no such statements here.

Fourth, Biomet doesn't demonstrate how a reasonable plaintiff would have seen or understood the Instructions for Use that Biomet argues should have put her on notice. They're directed to the operating surgeon, not the patient. While the Instructions for Use caution about "histological reactions involving various sizes of macrophages and fibroblasts," they then backtrack, explaining that "similar changes may occur as a precursor to or during the healing process."

They explain that "[p]articulate wear debris and discoloration from metallic and polyethylene components of joint implants may be present in adjacent tissue or fluid," which could "result[ ] in osteolysis." They explain a report associating articulating surfaces and "increased genotoxicity." They also add necessary caveats, that the report "did not assess either the clinical relevance of the data or make any definite conclusions as to which metal ions or interactions . . . might be responsible for the observed data," cautioning that "an association does not necessarily mean a causal relationship." Biomet might show how a reasonable surgeon would have been aware of the product's risks, but doesn't show how a reasonable plaintiff should have seen or understood the document.

Last, in two of the three cases, either a class action had been filed or an MDL formed, with the consequent publicity and attorney advertising. The Biomet MDL wasn't formed until well over a year after Biomet's proposed bar date.

Under even the most liberal construction of the states' "discovery rules," Biomet doesn't show that these materials would have had the cumulative effect of putting all plaintiffs on constructive notice of a potential claim by February 10, 2011. What Biomet knew by the proposed bar date can't be attributed to the reasonable plaintiff. Biomet didn't target information to patients notifying them of the possible risks or demonstrate that reasonable plaintiffs are reading medical journals or the FDA website. Without a torrent of press coverage surrounding a decision to pull the product from the market or to change its label, Biomet hasn't shown that a reasonable plaintiff would know of a potential claim. I decline Biomet's request to establish a February 10, 2011, bar date.

III. Ms. Brown's Background

Ms. Brown received an implant in her left hip on November 3, 2009. The operative report indicated that Biomet manufactured three of the four implanted components, and listed the fourth as manufactured by DePuy, but Ms. Brown's surgeon reportedly informed her that she would be implanted with a DePuy metal-on-metal device. After Ms. Brown began experiencing pain in her left hip, she visited a physician in June 2010 and was diagnosed with a "loose total joint." The implant was removed during revision surgery on March 6, 2012, and replaced by an implant with a polyethylene liner and ceramic head.

In March 2012, shortly after her revision surgery, Ms. Brown contacted an attorney to represent her in an action to recover damages caused by her hip implant. On, on November 9, 2012, she filed suit against DePuy and Johnson & Johnson.

At some point in the course of that litigation, Ms. Brown became aware of the fact that it was a Biomet component that had failed. She filed this suit against Biomet on April 11, 2014.

IV. Choice of Law

Ms. Brown's complaint was originally filed in the Eastern District of Louisiana, and is governed by Louisiana choice of law rules. *See* In re Watson Fentanyl Patch Prod. Liab. Litig., 977 F. Supp. 2d 885, 888 (N.D. Ill. 2013) (recognizing that the "choice of law rules that apply are those of the state where

the case originated"). Under those rules, Louisiana law provides the statute of limitations on Ms. Brown's claims. *See* La. Civ. Code Ann. Art. 3549 ("when the substantive law of this state would be applicable to the merits of an action brought in this state, the prescription and preemption law of this state applies").

V. DISCUSSION

A. *Louisiana Product Liability Act Claims*

Claims under Louisiana's Product Liability Act must be brought within one year from the date of injury. La. Civ. Code Ann. Art. 3492. "[T]he mover bears the burden of proving prescription", but "if the petition is prescribed on its face, then the burden of proof shifts to the Plaintiff to negate the presumption by establishing a suspension or interruption." Taranto v. Louisiana Citizens Prop. Ins. Corp., 62 So. 3d 721, 726 (La. 2011); Raborn v. Albea, 144 So. 3d 1066, 1071, (La. Ct. App. 2014).

Ms. Brown filed this complaint in April 2014, more than four years after the device was implanted ikn November 2009, and more than a year after her March 2012, revision surgery, the latest possible date of her injury. Her product liability claims are untimely, unless she can prove that the statute of limitations was tolled. Ms. Brown asserts that it was tolled under Louisiana's version of the discovery doctrine, the *contra non valentem* doctrine, because she reasonably relied on her doctor's statement that she was implanted with a DePuy device.

The *contra non valentem* doctrine "is based on the theory that when the claimant is not aware of the facts giving rise to his or her cause of action against

11

the particular defendant, the running of prescription is . . . suspended until the tort victim discovers or should have discovered the facts upon which his or her cause of action is based." In re Med. Review Panel of Howard, 573 So. 2d 472, 474 (La. 1991). "Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent[,] or unreasonable." Id. "When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction . . . in light of plaintiff's own information and the diagnoses [she] received." Raborn v. Albea, 144 So. 3d at 1072. Under Louisiana law, the limitations period is tolled if the plaintiff "reasonably relied on her treating physician regarding the cause" of the injury. Lapuyade v. Rawbar, Inc., 190 So. 3d 1214, 1224 (La. Ct. App. 2016).

Ms. Brown filed her first lawsuit against DePuy and Johnson & Johnson on November 9, 2012, because she thought that DePuy manufactured her hip implant. But her own medical records state that three out of the four components implanted were manufactured by Biomet. [Doc. No. 145-2]. A reasonable investigation into the facts that formed the basis of Ms. Brown's claims would have revealed the true identity of the manufacturer, before the suit was filed. But Ms. Brown waited seventeen months after filing suit against DePuy and Johnsons & Johnson to sue Biomet. Because Ms. Brown could and should have discovered that a Biomet device allegedly caused her injuries by on or before November 9, 2012, the *contra non valentem* doctrine doesn't save her facially untimely claims.

Ms. Brown says her complaint against Biomet should relate back to the date she filed her complaint against DePuy and Johnson & Johnson under La. Code Civ. Proc. Ann. Art. 1153. The Louisiana Supreme Court developed the following criteria to determine whether La. Civ. Code Ann. Art. 1153's relation back doctrine applies when the defendants are modified by an amendment to the complaint:

> (1) The amended claim must arise out of the same transaction or occurrence set forth in the original petition; (2) The purported substitute defendant must have received notice of the institution of the action such that he will not be prejudiced in maintaining a defense on the merits; (3) The purported substitute defendant must know or should have known that but for a mistake concerning the identity of the proper party defendant, the action would have been brought against him; (4) The purported substitute defendant must not be a wholly new or unrelated defendant, since this would be tantamount to assertion of a new cause of action which would have otherwise prescribed.

Renfroe v. State ex rel. Dep't of Transp. & Dev., 809 So. 2d 947, 950–951 (La. 2002).

Ms. Brown's complaint against Biomet doesn't meet those requirements. It's not an amended complaint correcting a misnomer or substituting the true party in interest, but rather a new complaint filed against a new and unrelated defendant. Biomet didn't receive notice of the original action, and, contrary to Ms. Brown's assertion, would be prejudiced by allowing her to go forward with her lawsuit now.

B. *Redhibition Claim*

Biomet seeks summary judgment on Ms. Brown's redhibition claim, contending that it too is barred by Louisiana's one-year statute of limitations, La. Civ. Code Ann. Art. 2534(2)(B). Ms. Brown didn't contend otherwise, and so waived any argument that her redhibition claim was timely. *See* <u>Laborers' Int'l Union of N. Am. v. Caruso</u>, 197 F.3d 1195, 1197 (7th Cir. 1999) (recognizing that arguments not raised in response to a summary judgment motion are waived).

## VI. CONCLUSION

For the foregoing reasons, Biomet's motion for summary judgment [Doc. No. 137] is GRANTED.

SO ORDERED.

ENTERED:  March 26, 2017

         /s/ Robert L. Miller, Jr.
        Judge
        United States District Court